Lee Turzillo and Lucille Turzillo v. Commissioner.
Turzillo v. Commissioner
Docket No. 94945.
United States Tax Court
T.C. Memo 1963-317; 1963 Tax Ct. Memo LEXIS 28; 22 T.C.M. (CCH) 1664; T.C.M. (RIA) 63317; December 2, 1963
*28 Richard Katcher 1130 B. F. Keith Bldg. Cleveland, Ohio, and James J. Laughlin, for the petitioner. Joseph P. Crowe and Gordon B. Cutler, for the respondent. SCOTT Memorandum Findings of Fact and Opinion SCOTT, Judge: Respondent determined a deficiency in petitioners' income tax for the calendar year 1958 in the amount of $35,300.02. The issue for decision is whether an amount of $95,000 received by Lee Turzillo in 1958 from a corporation in which he had owned stock and by which he had been employed, in settlement of litigation between him and the corporation, was ordinary income or capital gain. Findings of Fact Some of the facts have been stipulated and are found accordingly. Petitioners, husband and wife residing in Akron, Ohio, filed a joint Federal income tax return for the calendar year 1958 with the district director of internal revenue at Cleveland, Ohio. Petitioners determined their Federal income tax liability by the cash receipts and disbursements method of accounting. In 1934, Lee Turzillo (hereinafter referred to as petitioner) was employed by Durite Company, a corporation which in 1943 changed its name to Intrusion-Prepakt, Incorporated (hereinafter *29 referred to as Intrusion). Intrusion is a corporation engaged in a specialized branch of the concrete and contracting business in Cleveland, Ohio, and other places. From 1934 to 1946 there was a substantial growth and expansion in the business of Intrusion. About 1940 petitioner became a vice president of Intrustion. By 1950 he was vice president and chief executive officer with responsibilities for obtaining of contracts, bidding, and various other duties of an administrative nature. Prior to September 20, 1954, all of Intrusion's issued and outstanding stock was owned by Louis S. Wertz (hereinafter referred to as Wertz), its president. On September 17, 1954, the certificate of incorporation of Intrusion was amended by changing the provision with respect to its capital stock to provide that the total number of shares of stock should consist of 980 shares of class A common stock without par value and 20 shares of class B common stock without par value and that on all matters except the election of the board of directors of the corporation the holders of the class A common stock and class B common stock shall be entitled to one vote per share. The certificate as amended provided *30 that the presently authorized and issued 420 shares of common stock of the corporation be changed and reclassified into 935 shares of class A common stock without par value. It also provided that the holders of a majority of the shares of class B common stock should have the right to vote separately as a class to elect not less than two-fifths of the members of the board of directors of Intrusion and the holders of a majority of the shares of class A common stock should have the right to elect the remaining members of the board of directors. Wertz became the owner of 948 shares of class A common stock and no other shares of this stock were issued. Petitioner and Paul D. Smith (hereinafter referred to as Smith) each subscribed for and became the owner of 10 shares of class B common stock, and each paid $10,000 for that stock. Smith, prior to 1954, had been employed by Intrusion and as of September 20, 1954, was a vice president of that company. On September 21, 1954 Intrusion and Wertz entered into an agreement which provided in part as follows: WHEREAS the parties, in furtherance of the interests of the Corporation, desire to establish continuity of management and of consistent *31 and harmonious policies; and WHEREAS, in order to assure to the Corporation continuity of management by persons who have a proprietary interest in the Corporation, other persons actively engaged in management of the Corporation have this day purchased shares in the Corporation upon condition that the Shareholder enter into this Option Agreement; NOW, THEREFORE, in consideration of the premises and of other valuable considerations, receipt of which is hereby acknowledged, the undersigned do agree each with the other, as follows: 1. The Shareholder shall not sell any shares in the Corporation, or any interest therein, during his lifetime without first offering such shares to the Corporation for purchase at the option price. Such offer shall be in writing, signed by the Shareholder, shall specify the number of shares offered, the option price applicable thereto and the other terms of the sale contemplated by the offering Shareholder, and shall be delivered to any member of the Board of Directors of the Corporation elected by the holders of Class B Common Stock of the Corporation. * * * 2. The Shareholder, on behalf of himself, his heirs, executors, administrators and assigns, *32 hereby grants to the Corporation the option of purchasing all shares in the Corporation owned by him at the date hereof, together with any such shares as are hereafter acquired by him, his heirs, executors, administrators and assigns and whether such shares are legally or beneficially owned, including, but without limiting the generality of the foregoing, and and all other or additional shares in the Corporation which may be acquired hereafter by reason of ownership of shares in the Corporation whether acquired by stock dividend, split up, combination, reclassification, reorganization, consolidation or merger, upon the terms and conditions hereinafter provided. The option may be exercised as to all but not part of such shares at any time during the twelve (12) month period beginning with the day after the date of death of the Shareholder upon unanimous authorization by the members of the Board of Directors of the Corporation elected by the holders of Class B Common Stock of the Corporation. Exercise of the option shall be by written notice to that effect to the executor or administrator of the Shareholder and to any other registered holder of such shares. Within fifteen (15) days after *33 exercise, the executor or administrator of the Shareholder and each other registered holder of such shares shall deliver to the Secretary of the Corporation the certificate or certificates representing such shares, accompanied by such instruments as may be necessary or desirable for transfer thereof, against payment of the option price for such shares. 3. In order to assure to the Corporation the benefit of this agreement, the Shareholder shall not during his lifetime, and his heirs, executors and administrators shall not after his death, and prior to the expiration of the option herein granted, sell, exchange, give, transfer, pledge, hypothecate or otherwise dispose of any shares in the Corporation or any interest therein, whether such shares are presently owned or are hereafter acquired, and whether such shares are legally or beneficially owned, except as provided in this agreement. The price provided for in this agreement was $1,000 per share minus any distributions made after the date of the agreement and prior to the payment of the option price with the provision that $300 of the option price be paid in cash and the balance by delivery of the promissory note of the corporation *34 payable 8 years from its date of delivery with interest payable 6 months after the date thereof and semiannually thereafter. The agreement provided that Wertz during his lifetime might offer his stock for sale to the corporation at a price of less than $1,000 per share and further provided that should the number of shares subject to the agreement be increased or decreased, the aggregate price of all shares held by Wertz should at all times be $948,000, and the cash to be paid be $284,400 minus in both instances the sums of any prior distributions. On September 21, 1954, petitioner and Smith entered into an agreement with Intrusion which provided in part as follows: WHEREAS the Shareholders are executive officers, actively engaged in management of the Corporation; and WHEREAS the parties, in furtherance of the interests of the Corporation, desire to establish continuity of management and of consistent and harmonious policies; and WHEREAS in order to assure to the Corporation continuity of management by persons who have a proprietary interest in the Corporation, the Shareholders have this day purchased Class B Common Stock in the Corporation, and the Corporation has sold to *35 them such Class B Common Stock, upon condition that the Shareholders enter into this Option Agreement; NOW, THEREFORE, in consideration of the premises and of other valuable consideration, receipt of which is hereby acknowledged, the undersigned do agree each with the other as follows: 1. Each Shareholder, on behalf of himself, his heirs, executors, administrators and assigns, hereby grants to the Corporation the option of purchasing all shares of Class B Common Stock in the Corporation owned by him at the date hereof, together with any such shares as are hereafter acquired by him, his heirs, executors, administrators and assigns, and whether such shares are legally or beneficially owned, including, but without limiting the generality of the foregoing, any and all other and additional shares of Class B Common Stock in the Corporation which may be acquired hereafter by reason of ownership of such shares in the Corporation, whether acquired by stock dividend, split up, combination, reclassification, reorganization, consolidation or merger, upon the terms and conditions hereinafter provided. 2. The option may be exercised as to all but not part of such shares at any time during *36 the twelve (12) months' period (hereinafter referred to as the "option period") beginning with whichever of the following shall be the earlier the day after the date of such Shareholder's death, or the date upon which the employment of such Shareholder shall be terminated by the Corporation for adequate cause or shall be terminated by such Shareholder without adequate cause. Exercise of the option shall be by written notice to that effect to the Shareholder, or to his heirs, executors, or administrators or to any other registered holder of the shares subject to this agreement. Within forty-five (45) days after exercise, the Shareholder, or his executors or administrators, or other registered holder, as the case may be, shall deliver to the Secretary of the Corporation the certificate or certificates representing such shares, accompanied by such instruments as may be necessary or desirable for transfer thereof, against payment of the option price in cash for such shares. This agreement provided for the method of computing the option price of the class B stock in the event of the shareholder's death and the option price in the event the option date began with a date other than the *37 shareholder's death in each case stating that the method which resulted in the lesser amount would be the option price. One of the option price computations to be used in the event the option date began at a date other than the date of the shareholder's death was set forth in paragraph 3(c) of the agreement and provided that there be added to the amount of $20,000, an amount equal to simple interest thereon at the rate of 10 percent per annum from the date of the agreement to the date of exercise of the option, subtracting from the total any amount of distributions made by the corporations to the shareholder after the date of the agreement, and dividing the resultant amount by the number of shares of class B stock outstanding at the date of the exercise of the option. This agreement also provided for an equitable adjustment of the option price in case the number of shares of class B stock was increased or decreased. Under date of September 21, 1954, Intrusion and Wertz entered into an agreement whereby Intrusion agreed to employ Wertz as an executive for a period of 15 years at a salary of $20,000 a year. The agreement also contained numerous specific provisions with respect to the *38 terms of Wertz's employment. On September 21, 1954, petitioner entered into an agreement with Intrusion wherein Intrusion agreed to employ petitioner as an executive, petitioner agreeing to serve the corporation and its subsidiary companies in that capacity for a term of 15 years. Intrusion agreed to pay petitioner for his services a salary of $13,200 pet year plus 5 percent of the corporation's consolidated net profits for each fiscal year beginning with the fiscal year ending February 28, 1955, or such higher compensation as the board of directors in its sole discretion might from time to time determine. Effective March 1, 1955, petitioner's compensation as provided for by this agreement was changed to $18,200 per year plus 5 percent of the consolidated net profits of Intrusion above $100,000. A similar employment agreement was entered into on the same date between Intrusion and Smith. The employment agreements of petitioner, Smith and Wertz with Intrusion each provided that the executive would render his business services solely for Intrusion and its subsidiaries and would not engage in or invest in or have any interest in any business competitive with the business of Intrusion *39 or its subsidiaries without the consent of Intrusion and would not assist or advise any firm competitive with Intrusion and its subsidiaries (with an exception in the case of Wertz not here pertinent). Each of these agreements also provided that all inventions, improvements, and discoveries which the executive might make during the term of the agreement would become the sole and exclusive property of the corporation. Each further provided that the agreement was subject to termination in the event the executive became disabled. As of September 21, 1954, Intrusion and its subsidiaries had a combined value of approximately $1,000,000. After September 21, 1954, petitioner was a director of Intrusion and its executive vice president. His duties as executive vice president remained substantially the same as his duties had been as vice president and chief executive officer prior to September 21, 1954. After September 21, 1954, Smith continued as a vice president of Intrusion, primarily responsible for the office and financing of the corporation. On January 11, 1955, at a special meeting of the board of directors of Intrusion at which all of the directors except petitioner were present, *40 following a discussion with respect to a lack of coordination within the management of the company a resolution was passed that an outside management consultant be employed for the purpose of evaluating the affairs of the company and recommending to the board of directors any changes he considered to be needed in the company's organization, policies, and procedures. At a special meeting of the board of directors of Intrusion held on October 3, 1955, resolutions were adopted which removed petitioner from his position as executive vice president of Intrusion and created the position of general manager of field operations. At this same meeting Smith was elected executive vice president of Intrusion and petitioner was appointed general manager of field operations. The action taken by the board of directors was in accordance with the suggestion of the management consultant employed by Intrusion pursuant to the resolution of January 11, 1955. The duties assigned to petitioner as general manager of field operations were more limited in scope than his duties as executive vice president had been. On December 8, 1955, Intrusion notified petitioner of the termination of his employment. *41 Under date of December 15, 1955, petitioner replied to Intrusion's letter of December 8, 1955, stating that it was Intrusion and not he who breached his employment contract. The letter dated December 15, 1955, further stated: "The agreements of September 21, 1954, contemplated that I would become one of two equal owners of the Corporation (with its subsidiaries) by making payments to the Wertz estate accumulated solely out of the future earnings potential" and recited in some detail petitioner's view with respect to the disagreements which arose between him and Intrusion in connection with his employment by that corporation and the termination thereof. In February 1956, petitioner commenced a lawsuit in the Court of Common Pleas, Cuyahoga County, State of Ohio, against Intrusion and its directors. In an amended petition for money, accounting, injunction, and equitable relief filed by petitioner in that action, petitioner in his alleged first cause of action set forth the changes in its certificate of incorporation made by Intrusion on September 17, 1954, and following this statement, alleged: As a part of said reorganization, a general contract was made which was evidenced by the *42 several specific written agreements hereinafter mentioned, all of which were simultaneously executed and delivered. The purpose of said contract was to provide a method whereby the ownership of the corporation's share and the executive responsibility for the operation of the company's affairs might be finally shifted from the defendant Wertz to the defendant Smith and to the plaintiff [petitioner]. There followed a recital of the terms of the various agreements of September 21, 1954, with respect to the employment of Wertz, petitioner, and Smith by Intrusion, and the agreement of each Wertz, petitioner, and Smith with Intrusion with respect to the purchase by Intrusion of the stock of each of them. Petitioner in his first cause of action further alleged that Intrusion and its directors were guilty of unlawful conduct toward him in that the four directors conspired to cause the corporation to breach its contract with him by ousting him from his position as chief executive officer of Intrusion. Following these allegations, the concluding allegations of petitioner's first cause of action were as follows: The Defendants hereby made it impossible for Plaintiff to build up and create *43 the profits with which the Defendant Corporation would be enabled to purchase said Class A Stock and pay for the same when the option therefor should become effective. The Defendants thus made performance of said contract impossible for Plaintiff to accomplish. Thereupon the Defendants also purported to exercise an alleged right under said option for the Corporation to purchase Plaintiff's shares in the Defendant Corporation, on the claim that Plaintiff had terminated the employment without adequate cause, whereas in truth and in fact, the Defendant Corporation had terminated the employment without adequate cause. Plaintiff says that the Defendant Corporation through the efforts of Plaintiff and other executives had developed an enviable reputation in the engineering and contracting business for skill and ingenuity in the process and methods of inserting special concrete mixes into difficult and normally inaccessible places, and that said contract offered boundless opportunities and unlimited possibilities for profit, of which Plaintiff had the right to become and be a half-owner, according to the terms of said contract, which established Plaintiff as the owner of one half of the *44 B shares of the Defendant Corporation as aforesaid, and also established a method for the retirement of the A shares which would leave the B shares as the only outstanding shares of the Corporation. Plaintiff says that said contract constituted as asset to him having a value of not less than One Million Dollars ($1,000,000.00), and that by reason of the Defendants' above described unlawful conduct and breaches of contract he has been irreparably harmed and damaged in a manner and to an extent for which there is no adequate remedy at law, but which will damage him in an amount which is undeterminable but in any event is not less than the sum of One Million Dollars ($1,000,000.00). As a second cause of action petitioner alleged that 5 percent of Intrusion's consolidated net profits for the fiscal year ended February 28, 1955, were in excess of $15,000, the exact amount being indeterminable until an accounting was had between him and Intrusion and that Intrusion had failed to account to him and pay him the amount due to him as 5 percent of the consolidated net profits. As a third cause of action petitioner alleged that he had entered into a contracting business through a corporation *45 created and owned by him known as Lee Turzillo Contracting Company, and that Intrusion and its directors had endeavored to hamper and impede his business by falsely asserting its right to prevent him from performing work in competition with Intrusion and to prevent him from obtaining certain equipment on the ground that the designs for such equipment were the property of Intrusion and by circulating falsehoods relating to his business. As a fourth cause of action petitioner alleged that he was being done irreparable damage by Intrusion's notice to him of its claim of right to exercise its option to purchase his class B shares in Intrusion and by Intrusion's having filed a suit against him in the United States District Court for the Northern District of Ohio, Eastern Division, to enforce its option to purchase his class B shares of stock. Petitioner's amended petition contained the following prayers for relief: 1. That judgment be rendered for Plaintiff and against Defendants and each of them for the sum of One Million Dollars ($1,000,000.00) damages suffered by Plaintiff as a result of Defendants' causing said breach of said contract; 2. That an accounting be had between Plaintiff *46 and the Defendant Corporation to determine the amount of its consolidated net profits and the benefit due to Plaintiff by reason of his contractual five per cent share thereof; and that judgment be rendered for Plaintiff and against the Defendant Corporation for Plaintiff's share of the amount determined by said accounting; 3. That Defendants and each of them be permanently enjoined from impeding or hampering Plaintiff's business operations by asserting alleged rights which they do not possess and by circulating falsehoods concerning. Plaintiff and his business; 4. That Defendants and each of them be permanently enjoined from asserting claims against Plaintiff for damages or for specific performance based on an alleged right under the option agreement relating to Plaintiff's shares in the Defendant Corporation. 5. That pending final order herein, a temporary restraining order shall issue, prohibiting the individual defendants and each of them and the corporate defendant and its officers, agents, servants and employees and each of them from doing, threatening or attempting to do things described in the preceding two paragraphs hereof; 6. That judgment be rendered for Plaintiff *47 and against Defendants and each of them for Plaintiff's costs herein sustained; and 7. That such other and further relief be granted to Plaintiff as may be just and equitable in the premises. Intrusion filed a separate answer and counterclaim to petitioner's amended complaint in the Court of Common Pleas of Cuyahoga County, State of Ohio, in which it admitted certain of the factual allegations of the first cause of action of petitioner's complaint, denied other of such allegations and specifically denied "that the various agreements alleged to have been entered into on or about September 17, 1954, together constituted a single agreement among the plaintiff and defendants" and further specifically denied "that it conspired with any other defendant to deprive the plaintiff of any right whatsoever." Intrusion in this separate answer and counterclaim alleged that in the fall of 1955 petitioner refused and neglected to perform the executive duties assigned to him by Intrusion and ceased to devote his best efforts to advancing the business of Intrusion and that on or about December 8, 1955, Intrusion for adequate cause discharged petitioner and terminated his employment. Intrusion admitted *48 that 5 percent of its consolidated net profits for its fiscal year ended February 28, 1955, exceeded the sum of $15,000 and that the exact amount thereof could be shown by an accounting and denied the other allegations not admitted in connection with its answer to the second cause of action. In answer to petitioner's third cause of action Intrusion admitted that petitioner had entered into business through a corporation known as Lee Turzillo Contracting Company and denied the other allegations of that cause of action. In answer to petitioner's fourth cause of action Intrusion admitted that it had notified petitioner of its right to exercise its option to purchase all of the class B shares of common stock owned by petitioner in Intrusion, and that it proposed to enforce its right under the option agreement and denied the remaining allegations. As a counterclaim Intrusion in count one alleged that it had exercised its option to purchase the 10 shares of stock owned by petitioner but that petitioner had refused to deliver the stock to Intrusion in accordance with the option agreement and asked enforcement of the option agreement in equity since Intrusion was without adequate remedy at *49 law. As count 2 Intrusion alleged that petitioner had gained certain knowledge of its business while in its employ and that prior to December 8, 1955, while ostensibly continuing to discharge duties as general manager of field operations for Intrusion petitioner had planned and made arrangements for the organization and operation of the business of Lee Turzillo Contracting Company and did organize that corporation for the purpose of engaging in business in competition with Intrusion and soliciting existing and potential customers of Intrusion and did utilize and permit others to utilize trade secrets of Intrusion. Intrusion in this count sought to enjoin petitioner from utilizing its inventions and secrets for the purpose of competing with Intrusion. Intrusion's cross complaint contained the following prayers for relief: WHEREFORE, defendant Intrusion Prepakt, Incorporated, prays that it may have judgment against the plaintiff Lee Turzillo as follows: 1. Judgment against plaintiff Lee Turzillo decreeing specific performance of said option agreement entered into between him and defendant Intrusion Prepakt, Incorporated, on or about September 21, 1954, under the terms of which *50 said plaintiff did agree to sell to the said defendant his shares of said defendant's Class B Common Stock, and ordering and directing plaintiff Lee Turzillo forthwith to deliver to the said defendant his ten shares of the Class B Common Stock of the said defendant against payment of the option price in cash therefor provided in said agreement. 2. Judgment requiring the plaintiff Lee Turzillo to account to the defendant Intrusion Prepakt, Incorporated, for all profits heretofore or hereafter made by plaintiff Lee Turzillo, or by Lee Turzillo Contracting Company to which the defendant is or may be properly entitled. 3. Judgment imposing a constructive trust on all ownership and interest of plaintiff Lee Turzillo, whether direct or indirect, in the stock or ownership of the Lee Turzillo Contracting Company, and upon all the assets of Lee Turzillo Contracting Company for the benefit of the defendant, Intrusion Prepakt, Incorporated, and directing transfer of legal title thereto to the said defendant. 4. Judgment enjoining and restraining the plaintiff Lee Turzillo, for a period of five years, from engaging in any business through the medium of Lee Turzillo Contracting Company or *51 otherwise, competitive with or otherwise competing directly or indirectly with the defendant Intrusion Prepakt, Incorporated. 5. Judgment enjoining and restraining the plaintiff Lee Turzillo in perpetuity, without the consent of the defendant Intrusion Prepakt, Incorporated, from using or permitting the use by others of any invention or trade secret of defendant Intrusion Prepakt, Incorporated. 6. Judgment against the plaintiff Lee Turzillo for the sum of $100,000.00. 7. Judgment against plaintiff Lee Turzillo requiring him forthwith to resign his fiduciary position as a director of the defendant Intrusion Prepakt, Incorporated. 8. Judgment against the plaintiff Lee Turzillo for the costs of this action and for such other and further equitable relief as to the Court in equity and good conscience may appear to be appropriate. The allegations contained in petitioner's cross complaint in the case in the Court of Common Pleas of Cuyahoga County, Ohio were substantially the same as the allegations contained in a complaint filed by Intrusion in the United States District Court for the Northern District of Ohio, Eastern Division, against petitioner and Lee Turzillo Contracting Company *52 in April 1956. Petitioner filed an answer and cross complaint to the suit by Intrusion against petitioner and Lee Turzillo Contracting Company in the United States District Court for the Northern District of Ohio, Eastern Division, in which he admitted certain of the record facts alleged with respect to dates of entry into agreements and provisions of such agreements and denied all other allegations with respect to both counts one and two of Intrusion's complaint and in his cross complaint alleged substantially the same facts and sought substantially the same relief as he sought in his amended petition filed in the Court of Common Pleas of Cuyahoga County, Ohio. Intrusion filed an answer to this cross complaint admitting and denying substantially the same allegations as it had admitted and denied in its answer to petitioner's complaint in the suit filed in the Court of Common Pleas of Cuyahoga County, Ohio. During the pendency of the litigation between petitioner and Intrusion in the Court of Common Pleas of Cuyahoga County, Ohio and the United States District Court for the Northern District of Ohio, settlement negotiations were conducted by petitioner's attorney and the attorney *53 for Intrusion. Petitioner did not participate personally in these negotiations but was kept advised of their progress with respect to the dollar amount of the various proposals for settlement by his attorney. The first mention of settlement of the litigation was made by Intrusion's attorney to petitioner's attorney at the conclusion of the taking of a deposition of petitioner. Intrusion's attorney asked petitioner's attorney to remain after the deposition was concluded in order that he might talk to him. Intrusion's attorney stated to petitioner's attorney that the litigation should be settled and petitioner's attorney stated that the proposals would have to come from Intrusion. Under date of September 11, 1957, Intrusion's attorney addressed a letter to petitioner's attorney in which he stated that only now was he able to fulfill his promise to make a formal offer with respect to the terms upon which his client would be willing to settle the controversy represented by the litigation pending in the State and Federal Courts in which petitioner, Lee Turzillo Contracting Company, Intrusion and others were parties. The letter then set forth the following: In full settlement of all controversies *54 between the parties, to be accompanied by an exchange of mutual releases between your clients and mine, Intrusion-Prepakt, Incorporated, will: 1. Purchase all of Lee Turzillo's Class B stock in Intrusion-Prepakt, Incorporated, at the option price of $11,233.36; 2. Pay to Lee the sum of $75,000.00 in settlement of any alleged breach of contract, to be paid either in a lump sum or in deferred payments, as Lee may like; 3. Grant to Lee Turzillo Contracting Company a royalty-free, non-exclusive and non-assignable license for the life of the patents, to use, manufacture or sell, throughout the continental limits of the United States, any product or process covered by any United States patent in which Lee is named as an inventor, such license, however, to be terminable at any time that Lee or his immediate family shall cease to be the owners of the majority of the voting stock of the Lee Turzillo Contracting Company; 4. Grant to Lee Turzillo Contracting Company a royalty-bearing, non-exclusive and non-assignable license for the life of the patents, to use, manufacture or sell, throughout the continental limits of the United States, any product or process covered by any United States *55 patent at this date owned by Intrusion-Prepakt, Incorporated, (excluding, of course, the patents referred to above in which Lee Turzillo is named as an inventor), such license to be subject to payment of an annual royalty of one per cent of the gross contract revenue of Lee Turzillo Contracting Company during the year in question, with a minimum annual royalty of $5,000.00, and to be terminable at any time that Lee or his immediate family shall cease to be the owners of the majority of the voting stock of Lee Turzillo Contracting Company. Lee will recognize that the one per cent royalty rate is the same rate which Intrusion-Prepakt, Incorporated, is currently paying to Mr. Wertz for rights under said patents. In addition to the above, it would seem appropriate that Lee Turzillo Contracting Company should pay to Intrusion-Prepakt, Incorporated, a retroactive royalty covering the past use by Lee Turzillo Contracting Company of patented rights of Intrusion-Prepakt, Incorporated. The exact amount of such royalty is something that we can discuss. As a basis for such discussion, however, I suggest the sum of $3,500.00. On October 4, 1957, petitioner's attorney addressed a letter to Intrusion's *56 attorney in which he stated that he was authorized by petitioner and Lee Turzillo Contracting Company to make the following counter-proposals to the offer contained in the letter dated September 11, 1957: A. In numbered paragraph 2 of your offer, the settlement amount to be $140,000.00. B. In numbered paragraph 4 of your offer, change the license royalty to a flat annual royalty of $2,000.00, the licensee to have the right to terminate the license upon a 1 year advance notice to the licensor. C. The retroactive royalty to be arranged between us as we discussed it. Under date of December 12, 1957, Intrusion's attorney addressed a letter to petitioner's attorney with respect to the settlement negotiations in the litigation between Intrusion and petitioner in which the following is stated: In full settlement of all controversies between the parties, to be accompanied by an exchange of mutual releases between your clients and mine, by which each of them will fully and completely release the others from all claims and demands of every kind and character to this date accruing, Intrusion-Prepakt, Incorporated, will: 1. Purchase all of Lee Turzillo's Class B stock in Intrusion-Prepakt, *57 Incorporated, at the option price of $11,233.36; 2. Pay to Lee the sum of $105,000.00 in settlement of all of his claims of right to continued employment by Intrusion-Prepakt, Incorporated. This sum may be paid either in a lump sum or in deferred payments, as best suits Lee's tax picture. I, of course, do not know whether or not a part payment in the current calendar year will be of any substantial assistance to him. 3. Grant to Lee Turzillo Contracting Company a royalty-bearing, non-exclusive and non-assignable license for the life of the patents, to use, manufacture or sell, throughout the continental limits of the United States, any product or process covered by any United States patent at this date owned by Intrusion-Prepakt, Incorporated, (including such patents in which Lee Turzillo is named as an inventor), such license to be subject to the payment of an annual royalty of $3,000.00 and to be terminable by Intrusion-Prepakt, Incorporated, at any time that Lee or his immediate family shall cease to be the owners of the majority of the voting stock of Lee Turzillo Contracting Company. The above action by my clients shall be further conditioned upon Lee Turzillo Contracting *58 Company paying, concurrent with the closing of the settlement, to Intrusion-Prepakt, Incorporated, a retroactive royalty of $5,000.00 covering the past use by Lee Turzillo Contracting Company of patent rights of Intrusion-Prepakt, Incorporated. Under the foregoing arrangement your clients will be free to manufacture products under processes patented by my clients or to purchase such products from my clients on an arrangement mutually satisfactory to all parties. The choice in this respect and the terms upon which purchase of products can or cannot be arranged should be left to future negotiation. This I understand to be in accordance with the suggestion which you made to me at our last conference. I appreciate that this offer does not reach the sum in money which you have suggested to me would be satisfactory to Lee. I can only say that, as I have repeatedly told you, I have a sincere interest in trying to settle this controversy. As a result, I believe I have fairly and vigorously presented to my clients all of the factors in this case, which are pluses no the side of your client. I hope that your client will accept this offer, because I think the important thing for both sides *59 is to compromise their controversies and proceed to compete as their best judgment dictates, without being diverted by a lot of irrelevant issues. Under date of February 19, 1958, petitioner's attorney addressed a letter to Intrusion's attorney in which he stated that he was authorized by petitioner and Lee Turzillo Contracting Company to offer the following terms of settlement: That in full settlement of all controversies between the parties, to be accompanied by an exchange of mutual releases between your clients and mine, by which each of them will fully and completely release the others from all claims and demands of every kind and character to this date accruing, Intrusion-Prepakt, Incorporated, will: 1. Purchase all of Lee Turzillo's Class B stock in Intrusion-Prepakt, Incorporated, at the option price of $11,233.36; 2. Pay to Lee the sum of $95,000.00 in settlement of all of his claims of right to continued employment by Intrusion-Prepakt, Incorporated. 3. Grant to Lee Turzillo Contracting Company a royalty-free, non-exclusive and non-assignable license for the life of the patents, to use, manufacture or sell, throughout the continental limits of the United States, *60 any product or process covered by any United States patent at this date owned by Intrusion-Prepakt, Incorporated, (including such patents in which Lee Turzillo is named as inventor), such license to be terminable by Intrusion-Prepakt, Incorporated, at any time that Lee or his immediate family shall cease to be the owners of the majority of the voting stock of Lee Turzillo Contracting Company. Under the foregoing arrangement my clients will be free to manufacture products under processes patented by your clients or to purchase such products from your clients on an arrangement mutually satisfactory to all parties. The choice in this respect and the terms upon which purchase of products can or cannot be arranged should be left to future negotiation. If you will write me stating that the foregoing terms of settlement are accepted by you on behalf of you clients, we can then proceed without delay to make settlement. Under date of February 24, 1958, Intrusion's attorney addressed a letter to petitioner's attorney in which he stated that he was authorized by Intrusion and the other parties to the litigation to accept the terms of the offer made on behalf of petitioner and Lee Turzillo Contracting *61 Company in petitioner's attorney's letter dated February 19, 1958. During the course of these negotiations petitioner's attorney had numerous conferences with Intrusion's attorney and during these conferences did not specifically discuss with Intrusion's attorney any payment to petitioner for compensation for services or his agreement not to compete. Petitioner's attorney did not show petitioner the letters he addressed to Intrusion's attorney or the letters received by him from that attorney. The $11,233.36 which was set forth in the letter dated February 24, 1958, from petitioner's attorney to Intrusion's attorney as the price to be paid for petitioner's class B stock was calculated under the provisions of paragraph 3(c) of the agreement of September 21, 1954, whereby petitioner granted to Intrusion the option to purchase his stock. On April 3, 1958, petitioner and Lee Turzillo Contracting Company executed a release which provided that in consideration of the sum of $95,000 petitioner released Intrusion and its directors and each of them * * * from any and all claims of every kind and character whatsoever which he now has or may hereafter make or assert against them or any *62 of them for, on account of, or in any manner connected with or arising out of any matter or thing to this date occurring, including but not by this enumeration limited to, all claims and demands asserted by the undersigned LEE TURZILLO in the Amended Petition for Money, Accounting, Injunction and Equitable Relief filed by him in the Court of Common Pleas of Cuyahoga County, Ohio, in the case therein pending in which he is plaintiff and INSTRUSION-PREPAKT, INCORPORATED, LOUIS S. WERTZ, VIRGINIA W. BURDICK, PAUL D. SMITH AND HARRY F. BURMESTER are defendants, said case being identified in the records of said Court as No. 680626, all claims asserted in the Cross-Complaint filed by LEE TURZILLO and LEE TURZILLO CONTRACTING COMPANY in the case pending in the United States District Court for the Northern District of Ohio, Eastern Division, in which INTRUSION-PREPAKT, INCORPORATED, is Plaintiff and LEE TURZILLO and LEE TURZILLO CONTRACTING COMPANY are defendants, said case being identified in the records of saidcourt as No. 32760, and all claims of every kind and character whatsoever arising out of or in any manner connected with the employment of LEE TURZILLO by INTRUSION-PREPAKT, INCORPORATED, *63 and the termination of such employment, any right or claim of right to the continuance of such employment, whether by contract or otherwise. This release further provided that in consideration of the payment of $95,000 to petitioner, Lee Turzillo Contracting Company joined in the release of Intrusion and each of its directors from all claims of every kind and character which it now has or may ever make or assert against them in connection with the matters in the same litigation referred to in connection with petitioner's release. At the closing of the settlement when this release was given two checks, one in the amount of $11,233.36 and the other in the amount of $95,000, were handed to petitioner, and petitioner handed to representatives of Intrusion his certificate of stock endorsed in bank. Petitioners on their income tax return for the calendar year 1958 reported as long-term gain from the sale or exchange of capital assets and amount of $86,983.36 which was explained by the statement "Intrusion Prepakt - Law Suit Settlement - Including Transfer of Stock." The gain was arrived at by showing sales price of $106,233.36, which gross sales price was reduced by the amount of $19,250, *64 consisting of cost or other basis of $10,000 and expense of sale of $9,250. Respondent in his notice of deficiency increased petitioner's income as reported by the amount of $43,364.06, which amount was arrived at by using as the sales price of petitioner's stock in Intrusion $11,233.36, the cost of the stock of $10,000, and expenses applicable to the sale of $978.12, but considering the amount of $95,000 reduced by $8,271.88 of expenses applicable thereto as having been received by petitioner from cancellation of employment rights and therefore constituting ordinary income. In explanation of his adjustments respondent stated: * * * It is held that the settlement effected is separable into two parts, (1) sale of your stock of Intrusion Prepakt, Incorporated, for $11,233.36 and (2) payment to you of $95,000.00 for cancellation of your employment rights in said company. The amount paid you for cancellation of your employment rights is held to constitute "ordinary income" for the reason that it was a substitute for compensation for services. Petitioner in his petition alleged that the Commissioner erred in determining that of the $106,233.36 received by him in 1958 from Intrusion *65 $95,000 constituted ordinary income "rather than long-term capital gain from the sale of petitioner's stock in said corporation." Opinion Petitioner in his brief takes the position that the $106,233.36 paid to him by Intrusion in settlement of the litigation between them was for his class B stock in Intrusion and his relinquishment of his contractual rights to become a one-half owner of Intrusion. It is petitioner's position that the entire payment represented the proceeds from the sale or exchange of a capital asset held for more than 6 months. Petitioner does not distinguish between what he contends to be the contractual rights which he had to become a one-half owner of Intrusion and the class B common stock of Intrusion which he transferred to that corporation when the settlement of the lawsuits was effected. His position in this regard is that his contractual rights were a part of his stock ownership in that it was through this ownership of stock that he was to exercise his contractual rights to become a one-half owner of Intrusion. Respondent takes the position that the litigation involved both the right of Intrusion to require petitioner to transfer to it his class B common *66 stock in accordance with and for the price stated in the agreement between petitioner and Intrusion dated September 21, 1958, and as a separate matterpetitioner's rights with respect to his employment contract with Intrusion and the benefits which might have resulted to petitioner had this employment contract remained in force between him and Intrusion. It is respondent's position that the settlement clearly envisioned the payment of $11,233.36 for petitioner's stock and $95,000 for his contractual rights with Intrusion which were basically employment rights. It is respondent's position that any rights petitioner might have had because of the various contracts which he, Smith, and Wertz had made with Intrusion were tied to his continued employment by Intrusion and therefore any payment received in connection with these rights would represent ordinary income. Respondent points out that petitioner's right to continue to remain a stockholder was only so long as he continued to be an employee of Intrusion since petitioner when he became a stockholder had signed an agreement whichprovided that Intrusion might purchase his stock from his estate if he died while still a stockholder and from *67 him if he left the employ of Intrusion either on his own initiative without cause or on Intrusion's initiative with cause. Respondent furtherpoints out that involved in the litigation which was settled was the contention by petitioner that Intrusion had terminated his services without cause and Intrusion's contention that petitioner's services had been terminated by it for cause. Both parties agree that the classification of amounts received in settlement of a lawsuit as between ordinary income and capital gain depends upon and is to be determined by the nature of the litigation with respect to which the payment in settlement is made. ; and , affirmed (C.A. 1, 1944), certiorari denied . The difference between the parties is as to the nature of the issues settled in the lawsuits here involved. We think it is clear from the facts which we have recited in some detail that the amount of $11,233.36 was paid separately for the transfer of petitioner's stock to Intrusion. We likewise *68 think it clear that no part of the 95,000 was for salary or compensation due to petitioner for services rendered while he was an employee of Intrusion. There apparently at no time arose an issue as to salary payment up to the date that petitioner's employment by Intrusion was terminated and it appears from the facts we have set forth that Intrusion did not contest petitioner's right to receive 5 percent of the consolidated net profits of Intrusion for the fiscal year ended February 28, 1955, but merely stated that an audit would be required to determine the amount. [1] Therefore, from the evidence we conclude that no portion of the $95,000 represented compensation for petitioner's services to Intrusion rendered prior to the termination thereof on December 8, 1955. *69 Petitioner argues that the terminology used in the letters exchanged between his attorney and Intrusion's attorney should not be considered determinative that the payments were for the items as denominated therein. While we agree that these letters are not conclusive, they are persuasive evidence of the items settled. If we did not consider these letters as indicative of the items settled but merely looked to the release given by petitioner to Intrusion, there would be no basis for an allocation of the payment to petitioner between the various claims covered by the general release, one of which was "any right or claim of right to the continuance of such employment whether by contract or otherwise." Under such circumstances, petitioner would have failed to carry his burden of proof. Cf. However, we do agree with petitioner that the mere use of the words "all of his claims of right to continued employment" by his attorney in his letter to Intrusion's attorney in negotiating the settlement is not conclusive that the payment was necessarily ordinary income in lieu of compensation. We need to analyze the nature of the items covered *70 by petitioner's claims of right to continued employment to determine the nature of the payment. Petitioner alleged in his suits against Intrusion that the various individual contracts entered into on September 21, 1954, by Intrusion and each of its executive officers and stockholders constituted an overall general contract. Intrusion denied these allegations contending that no general contract existed but only the various individual agreements. From the correspondence between petitioner's attorney and Intrusion's attorney in connection with the settlement of the litigation, as well as the testimony of the witnesses at the trial, we conclude that the $95,000 was paid to petitioner in settlement of all the claims arising from this issue in the cases. A separate amount was set forth in the settlement for the portions of the litigation dealing with the transfer by petitioner of his stock to Intrusion and also there was a separate disposition of the various issues raised in connection with petitioner's operation of Lee Turzillo Contracting Company and the use of patents and processes of Intrusion in this operation. The allegations in connection with the issue which was settled by the *71 payment to petitioner by Intrusion of $95,000 deal with petitioner's rights to acquire an interest in Intrusion which rights could accrue to him only through his continued employment by that company until certain contingencies occurred. Petitioner had no agreement with Intrusion to acquire its stock. In fact petitioner's continued ownership of his stock was substantially conditioned on his continued employment by Intrusion. It might be that had petitioner's plans or hopes when he entered into his agreements with Intrusion on September 21, 1954, materialized he and Smith might have become the sole stockholders of Intrusion. Had petitioner remained in the employ of Intrusion and a stockholder thereof until such time as Intrusion's contractual rights to acquire Wertz's stock upon Wertz's leaving the employ of Intrusion or dying matured, and had Intrusion at such time been in a financial position to exercise its rights to acquire Wertz's stock and decided to do so, petitioner might have owned one-half of Intrusion's outstanding stock so long as he lived and remained employed by Intrusion. Certainly, whatever rights might have accrued to petitioner had he remained in Intrusion's employ *72 is purely conjectural. In analyzing whether the existence of the possibility that petitioner's stock might have come to be one-half of Intrusion's outstanding stock had petitioner remained in the employ of Intrusion until Wertz died or left the employ of Intrusion constituted a capital asset of such a nature that a payment received in connection therewith would be capital gain, petitioner's contingent rights must be considered in the light of his own agreement with Intrusion which permitted Intrusion to acquire his stock upon his death or his leaving Intrusion's employ. Even had petitioner come to own one-half of Intrusion's stock, he could not have disposed of his stock except by offering it to Intrusion and it it were offered to Intrusion because of his leaving the employ of Intrusion the price could not exceed the price he had paid for the stock plus an amount equal to 10 percent thereof per annum. Therefore, during petitioner's lifetime the only benefit petitioner could have received from the contingencies occurring while he was in Intrusion's employ to cause his stock to be one-half of Intrusion's outstanding stock, except to the possible extent of an increase of $1,000 per *73 year in the price to be paid for his stock, would be by way of salary, bonus and dividend payments from Intrusion. Each of these types of income is ordinary income. We therefore conclude that the payment of $95,000 to petitioner by Intrusion was to compensate him for the loss of future ordinary income and is taxable to him as ordinary income. ; ; and . This case is distinguishable from (C.A. 9, 1961), the case upon which petitioner primarily relies. In the Dorman case, the taxpayer had borrowed $300,000 from an individual with whom he agreed to form a partnership and had given that individual notes which were to be payable only out of profits of the partnership. The taxpayer there involved also received a salary for managing the partnership business. Before any payment had been made on the notes, the two parties agreed to dissolve the partnership, and since under their agreement, the partnership assets were valued in excess of $600,000, the taxpayer received *74 an amount in addition to the cancellation of his $300,000 of notes. In holding that the amount so received constituted capital gain the Court stated: * * * This right, or "option," to acquire a capital interest represents more than a possibility of receiving ordinary income in the future. It presents taxpayer a present opportunity to realize future capital gains, if any there be. And unlike the $12,470 payment to taxpayer was in no respect "present consideration received by the taxpayer for the right to receive future income,"but was paid in recognition of an already existing increase in the value of income producing property * * *. Petitioner in the instant case had no existing right to acquire property. Intrusion had some contingent right to acquire Wertz's stock, petitioner's stock and Smith's stock. The termination of petitioner's employment by Intrusion, terminated his possibility of benefiting from any of these agreements between Intrusion and its three stockholders. Since in our view the amounts received by petitioner from Intrusion had he continued longer in Intrusion's employ (other than the yearly $1,000 *75 on his stock which was separately provided for in settlement of the litigation) would have constituted ordinary income to him, the $95,000 payment to replace these amounts as ordinary income. Decision will be entered for respondent. Footnotes
1. Petitioner on brief states that an amount representing 5 percent of the net profits of Intrusion for its fiscal year ended February 28, 1955, had been paid by Intrusion to petitioner at some date previous to the date of the settlement of the lawsuits in 1958. While we have not found this fact to be shown in the record, the admission by Intrusion in its pleadings of petitioner's allegation with respect to this item leaves a fair inference that petitioner's statement on brief is in fact the situation.↩